** NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO 9/26/19

1            UNITED STATES DISTRICT COURT
             DISTRICT OF NEW HAMPSHIRE
2

3

     * * * * * * * * * * * * * * * *   *
4                                      *
     ANTENNASYS, INC.,                 *
5                                      *
                    Plaintiff,         *  No. 1:17-cv-00105-PB
6                                      *  Monday, June 24, 2019
     v.                                *  2:05 p.m.
7                                      *
     AQYR TECHNOLOGIES, INC., and      *
8    WINDMILL INTERNATIONAL, INC.,     *
                                       *
9                   Defendant.         *
                                       *
10   * * * * * * * * * * * * * * * *   *

11

                 TRANSCRIPT OF MOTION HEARING
12
           BEFORE THE HONORABLE PAUL J. BARBADORO
13

14

     APPEARANCES:
15

16   For the Plaintiff:      Steven J. Grossman, Esq.
                             Grossman Tucker Perreault
17                           & Pfleger PLLC
                             55 South Commercial St
18                           Manchester, NH 03101

19

20   For the Defendants:     Laura L. Carroll, Esq.
                             Eric G.J. Kaviar, Esq.
                             Burns & Levinson LLP
21                           125 Summer St
                             Boston, MA 02110
22

23   Court Reporter:         Brenda K. Hancock, RMR, CRR
                             Official Court Reporter
24                           United States District Court
                             55 Pleasant Street
25                           Concord, NH 03301
                             (603) 225-1454

1                    P R O C E E D I N G S

2          THE CLERK:  All rise for the Honorable Court.  Please

3     be seated.  This Court is in session and has for consideration

4     a motion hearing in Civil Matter 17-cv-105-PB, AntennaSys,

5     Incorporated v. AQYR Technologies, Incorporated.

6          THE COURT:  I'd like to begin by trying to have a

7     better understanding of the nature of the relationship between

8     the parties as envisioned by the license agreement.  I'll start

9     with the plaintiff and ask plaintiff to help me understand what

10    the plaintiff sees that agreement as requiring.  Keep in mind

11    this is a 12(b)(6) motion.  Excuse me.  Keep in mind this is a

12    summary judgment motion.  I'm not going to be making decisions

13    based on facts outside of the record, but I want to better

14    understand what the relationship is as envisioned in the

15    Licensing Agreement.

16         MR. GROSSMAN:  Well, your Honor, in our view Windmill

17    is the licensee under the agreement that licensed the agreement

18    with our client, Atennasys, and AQYR has been identified as a

19    wholly owned subsidiary of Windmill.  In this proceeding, your

20    Honor, Windmill and AQYR have separately been charged with

21    different claims.  We have various causes of action, state law,

22    against Windmill, chief of which is breach of the license

23    agreement to pay a royalty under the license agreement.

24         THE COURT:  What I'm asking, though, is to tell me

25    about the nature of the relationship that results from the

1   license agreement.  Is the interaction with the parties

2   governed solely by the license agreement.

3           MR. GROSSMAN:  That is our understanding, that AQYR is

4   a wholly owned subsidiary of Windmill.

5           THE COURT:  I get that, but I'm trying to understand

6   the relationship between AntennaSys and AQYR.  The two parties

7   to the license agreement are Windmill and AntennaSys.

8           MR. GROSSMAN:  That's correct.

9           THE COURT:  And so, let me be more clear, then.  I'm

10  trying to understand what is the relationship between Windmill

11  and Atennasys that is created by virtue of this agreement.

12          MR. GROSSMAN:  Thank you for clarifying.

13          THE COURT:  I understand the parent subsidiary issue.

14          MR. GROSSMAN:  Yeah.  Okay.  Thank you.  Windmill was

15  a licensee under the agreement of an invention that was created

16  both by Windmill inventor Mr. Webb -- I'm sorry -- an

17  AntennaSys inventor, Mr. Webb, and Windmill had an inventor,

18  Mr. David Martin.  They came up with an invention, and they

19  filed on it, which is the patent that's before the Court.

20          THE COURT:  And they assigned to their respective

21  employers.

22          MR. GROSSMAN:  That's correct.

23          THE COURT:  And the employers entered into an

24  agreement --

25          MR. GROSSMAN:  That's right.

1          THE COURT:  -- in which the --

2          MR. GROSSMAN:  That's correct.

3          THE COURT:  -- AntennaSys agrees to license its

4    interest in the patent to Windmill.

5          MR. GROSSMAN:  That's correct.

6          THE COURT:  And what I'm trying to understand is what

7    is that relationship?  Is it just an agreement in which they

8    agree to license their interest in the patent to Windmill and

9    they agree that they will be the exclusive licensee of the

10   patent?

11         MR. GROSSMAN:  That's correct.

12         THE COURT:  And they will take on responsibilities to

13   manufacture and distribute the product?

14         MR. GROSSMAN:  That's correct.  Yes.

15         THE COURT:  And they, then, have the exclusive right

16   under this patent to do that, and they have some obligation to

17   manufacture and distribute?

18         MR. GROSSMAN:  That's correct.  Just one

19   clarification, your Honor.  I concur with that analysis.  There

20   was an exclusivity provision and a nonexclusivity provision,

21   and the exclusivity provision, I don't have it right in front

22   of me, I didn't realize this question was coming, did have some

23   benchmarks where it would convert to a nonexclusive.  But, with

24   that said, your Honor's understanding of that agreement is

25   similar to mine.

1          THE COURT:  So, Windmill made a payment up front to

2     AntennaSys, right?

3          MR. GROSSMAN:  Yes.

4          THE COURT:  And, in exchange, they got this agreement?

5          MR. GROSSMAN:  That's correct.

6          THE COURT:  And they obligated themselves to do

7     certain things --

8          MR. GROSSMAN:  Yes.

9          THE COURT:  -- such as defend the patent?

10         MR. GROSSMAN:  That's correct.

11         THE COURT:  Okay.  And to market the product that is

12    protected by the patent?

13         MR. GROSSMAN:  That is correct.  You're absolutely

14    right.  And your Honor made mention of one provision.  Windmill

15    did agree to work together with AntennaSys.  Not only that;

16    they jointly prosecuted the patent, so they worked together,

17    and they had one representative that prosecuted for both

18    parties.  And Windmill also in the agreement agreed -- I

19    realize they may dispute this -- that they would use their good

20    faith to support the validity of the patent, and that's another

21    provision in the agreement as well that I --

22         THE COURT:  If I have correctly construed the patent,

23    you agree that the product that the subsidiary is selling does

24    not infringe?

25         MR. GROSSMAN:  That's correct.  That's the subject of

1    our motion, and that's what we have moved for judgment of

2    noninfringement.

3         THE COURT:  Right.  And if I am correct, and given

4    your stipulation, what is your current understanding of the

5    rights that you have under this contract, this license

6    agreement?

7         MR. GROSSMAN:  Let me rephrase and see if I got your

8    Honor's comment correct.  If you give judgment of

9    noninfringement, the product sold by AQYR would then not be

10   infringing.

11        THE COURT:  Right.  I'm asking a different question.

12   I understand that.

13        MR. GROSSMAN:  Yeah.

14        THE COURT:  I'm asking a different question.  What

15   obligations, if any, would Windmill still owe you under the

16   license agreement?

17        MR. GROSSMAN:  Good question, your Honor.  There are

18   other patents involved, so there would be some remaining

19   obligations under other patents, but under this particular

20   patent there would be no remaining obligations with regards to

21   the identified products.

22        THE COURT:  So, do you concede that by manufacturing

23   and selling the product that you contended in this lawsuit was

24   an infringing product, do you concede that, unless my

25   interpretation of the patent is overturned, that Windmill has

1    not breached the contract in any way by manufacturing and

2    selling that product?

3            MR. GROSSMAN:  Yes.  We would agree there's no breach

4    of the contract in the manufacturing and selling of that

5    product.

6            THE COURT:  Okay.  You know judicial estoppel, right?

7    He has just agreed and will be estopped for forever more

8    arguing that you have breached this contract in any way by

9    manufacturing and selling the alleged infringing product.

10   That's pretty good.  You should be really, really happy,

11   because he will acknowledge that the doctrine of judicial

12   estoppel will forever bar his client from contending otherwise.

13           Do you agree with that?

14           MS. CARROLL:  Do you want me to --

15           THE COURT:  Wherever you're comfortable.

16           MS. CARROLL:  I'll stay here.

17           THE COURT:  Okay.

18           MS. CARROLL:  And then Mr. Grossman doesn't have to --

19           THE COURT:  Whatever.  Whatever works.  You'll be both

20   back and forth for a while here, okay?

21           MS. CARROLL:  Yeah.  That would be --

22           THE COURT:  You like that, don't you?

23           MS. CARROLL:  I do like that.  I've got a big smile on

24   my face, and I haven't even had to argue anything yet.

25           THE COURT:  All right.

1          MS. CARROLL:  Our concern, your Honor, as you've seen

2     from our papers, is that the state law claims asserted against

3     both Windmill and AQYR are not just, "You breached the license

4     agreement by not paying us royalties under the agreement."

5     Instead, the state law claims -- there's five counts of state

6     law claims, some against Windmill, some against AQYR -- allege

7     that one of the things the defendants did wrong was design

8     around the patent-in-suit.

9          THE COURT:  I understand that, and that's why I began

10     with trying to understand the license agreement, and the way

11     he's described the license agreement it's quite simple and

12     straightforward, it is what it appears to be, which is an

13     agreement in which you're licensing your interest in the patent

14     to them in exchange for a payment and certain agreements by

15     Windmill to do certain things, to manufacture and distribute

16     the product and pay you royalties that they are required to pay

17     to defend the integrity of the patent.

18          He has now conceded that, if I have correctly

19     interpreted the patent, that is, unless -- and I grant their

20     motion for judgment with respect to the infringement claim, he

21     has conceded that there is no way in which Windmill or its

22     subsidiary could in any way be liable under this agreement

23     under any of these theories for anything they did with respect

24     to the alleged infringing product.  I recognize that the

25     Amended Complaint uses language that appears to be broader than

1      that, but we don't need to worry about that, because the

2      doctrine of judicial estoppel bars him from forever arguing

3      that those claims mean something than what he told me they mean

4      today.  He told me they mean today only that those claims can

5      be viable only if the product that is at issue in the

6      litigation infringes the patent, and since he agrees that under

7      the current interpretation it does not, it necessarily follows

8      from his concession that he cannot recover against you under

9      any of these theories unless and until he causes the Federal

10     Circuit to reverse me.

11            That's what I understand him to be saying, and if I

12     have misunderstood him, he needs to stand up and tell me.  But

13     he has agreed, notwithstanding what was said in the Amended

14     Complaint, that there is no possible way that you can be held

15     liable under any of these theories for designing around the

16     patent to prepare the product at issue.  You can't be held

17     liable.  He's told me that.  I'm relying on that.  In issuing

18     that order it seems self-evident to me that the doctrine of

19     judicial estoppel bars him from arguing otherwise in a future

20     proceeding.  If he doesn't think that's right, he needs to

21     stand up and tell me, because I'm relying on that.

22            MR. GROSSMAN:  Your Honor, you have it correct.

23            THE COURT:  Okay.  All right.

24            MS. CARROLL:  What's concerning me, your Honor, is --

25     well, I have a number of issues concerning me, but one of the

1    issues concerning me is that --

2         THE COURT:  You've won.  This is the thing.

3         MS. CARROLL:  I know I've won.

4         THE COURT:  You've won, 100 percent won, and you're

5    not taking your victory and going home.  I don't understand it.

6         MS. CARROLL:  Well, it's because, your Honor --

7         THE COURT:  You think I made I mistake, I guess.  You

8    think I have misconstrued the patent.

9         MS. CARROLL:  No, I don't.

10        THE COURT:  I might have, because, as I explained in

11   my opinion, trying to discern where this "fine line" is, given

12   Federal Circuit discussion about it, is a difficult thing, and

13   I might have not adequately anticipated what the Federal

14   Circuit has said.  I'm fine with that.  If I've made a mistake,

15   they'll correct me, but if I haven't made a mistake the case is

16   over.  You've won 100 percent.

17        MS. CARROLL:  Just to --

18        THE COURT:  Take your victory and go home.  Go ahead.

19   I'm sorry.  I'm being facetious.  Of course, I'll hear you out,

20   but it seems like you have gotten a slam-dunk victory here, and

21   I have acknowledged that I have struggled with interpreting --

22   I have tried as best I can to faithfully apply Federal Circuit

23   precedent.  I acknowledge with respect to the "stowed and

24   deployed" term that it is a challenge to faithfully apply that

25   precedent.  I tried my best to do it.  If they don't think I've

1    done it, they will, hopefully, respectfully say, "The Judge

2    tried, but we have a different view," and then we can come back

3    and we can do everything over.

4         But the idea that I'm going to march ahead under an

5    interpretation where all of my subsequent work will be

6    meaningless if I'm right and if I'm wrong I'll have to

7    completely redo it seems like an incredible waste of time.

8         MS. CARROLL:  Your Honor, I understand your position.

9    I want to raise just a couple of things that hopefully we can

10   address --

11        THE COURT:  Go ahead.  Okay.

12        MS. CARROLL:  -- because I would love to declare

13   victory and go home, too.  I'm not seeking to prolong this.

14        THE COURT:  Okay.

15        MS. CARROLL:  I guess my first question is, since as

16   it sounds like your Honor agrees, the state law claims, pretty

17   much all of them, accused our clients of wrongdoing by

18   designing around the patent.

19        THE COURT:  I agree.  I debate this with my law

20   clerks.  Why do people do this?  Well, a good lawyer, if it

21   were you or for the other side, when drafting a complaint is

22   going to draft the complaint in as broad a set of terms as they

23   think they can permissibly draw them, given the facts that are

24   available to them.  I agree with you that some of the language

25   in those causes of action can be read as somewhat broader than

1    simply a claim that by infringing they have also breached the

2    contract.  They have left open a little bit of wiggle room that

3    there might be an argument that, even though not infringing,

4    they nevertheless violate the contract or they nevertheless

5    give rise to a claim for breach of duty of good faith and fair

6    dealing, or they nevertheless constitute a Consumer Protection

7    violation.

8          I agree with you on that, that they could be read more

9    broadly, but he's disclaimed those readings in a way to induce

10   me to take a particular action, and I'm inclined to accept it

11   because it's an efficient and reasonable way to proceed.  It

12   saves you money.  It saves them money.  It allow us to get a

13   determination on a difficult question of law that I did my best

14   on but the Federal Circuit is, for all practical purposes,

15   authoritative on.

16         Apparently, there's a desire to proceed on appeal on

17   that issue.  I don't take offense at that at all.  It's

18   something that is a reasonable thing to do, and it will either

19   end the case because you'll win there, or it will give me

20   information that I can use to help you both fairly resolve the

21   case down the line.

22         MS. CARROLL:  And I appreciate that, your Honor.  So,

23   one issue is, in the event that the Fed. Circuit tweaks, as

24   they are wont to do, any of the construction of "stowed and

25   deployed" and we're back here, does this judicial estoppel mean

1    that when we come back we now need to deal with not just are

2    these infringing products, but if they're not still we're

3    liable for a design around?  I mean, do both of those arguments

4    come back into play?

5         THE COURT:  Let me try to summarize where I think we

6    would be, and either of you can disagree.  So, in the event

7    that the Circuit vacates my decision and remands with further

8    guidance in which they provide an alternative interpretation of

9    one or more key patent terms, at that point the judgment of

10    noninfringement would be vacated.  We would have to reassess

11    that particular issue.  We would also have to reassess whether

12    any or all of those additional state law claims would be

13    viable.  But one theory on which they would not be viable is

14    the theory that, even if they don't infringe, even if they have

15    not infringed, that the claims can be maintained on a

16    design-around theory --

17         MS. CARROLL:  Okay.

18         THE COURT:  -- because they are foregoing the

19    design-around theory.  That's my understanding.  Have I got

20    that right?  I don't want to press you to concede more than you

21    can concede, but that seems to follow logically from the

22    position that you are taking.  Those claims will be viable to

23    the extent that there's an infringement under the new theory,

24    but to the extent that there's no infringement under the new

25    theory the state law claims can't be maintained.

1    MR. GROSSMAN:  Well, we have some state law claims

2    that are not focused on just the design-around issue.  You

3    follow that.  In other words, we have breach of payment of

4    royalty, failure to mark.  There are other -- as you pointed

5    out in your conversations with the clerk --

6    THE COURT:  But you have told me that you can't

7    prevail on those claims without showing infringement.

8    MR. GROSSMAN:  Those claims -- we are willing to

9    dismiss those claims with full prejudice, subject to the

10   Federal Circuit's review of the claim construction order.  If

11   the claim construction order is reversed, the infringement

12   ruling is out.  In our state law claims we would have breach of

13   contract for not paying under the accused product, failure to

14   mark, and I see your Honor is not maybe favoring this, we would

15   then at that point like to pursue the design-around claim on

16   the grounds that they didn't make the now-established claimed

17   product.

18   THE COURT:  I understood you to be saying to me,

19   "Judge, we agree that, unless there is infringement by

20   manufacturing and selling the allegedly infringing product, we

21   have no claim against the plaintiff for the manufacture and

22   sale of that product either for infringement or under state

23   law."

24   MR. GROSSMAN:  That's correct.

25   THE COURT:  And so, if the Circuit remands --

1          MR. GROSSMAN:  Yes.

2          THE COURT:  -- and I take the guidance that the

3    Circuit gives me, and I construe the terms again, and we go to

4    summary judgment again, and I determine on summary judgment

5    that there is no infringement, I take your concession to be the

6    case is over at that point, because you have linked your

7    ability to pursue these state law claims to the proof of your

8    infringement claim.

9          MR. GROSSMAN:  Could I have a moment?

10         THE COURT:  Yeah, you talk that through.

11         MR. GROSSMAN:  Could I have a moment with my client?

12    Because I understand where the Court is now.  Could I have one

13    minute?

14         THE COURT:  Yes, take as long as you need, because I

15    don't want to force you into something.  I'm just telling you

16    that that's what I understood you to be saying, and I

17    understand the lawyer's desire to always leave as much room if

18    this happens.

19         MR. GROSSMAN:  Right.

20         THE COURT:  But if you want this remedy, it seems to

21    me, this result of judgment being entered so you can take an

22    expeditious appeal, the way to get it, clearly, is to agree

23    with what I'm saying, because in that case it is very clear to

24    me that your state law claims are dependent on your

25    infringement claim, and to the extent that they are not

1   dependent on your infringement claim for any reason, then I

2   have to go along and assess whether I should let the litigation

3   continue until the state law claims on the noninfringement

4   theories are adjudicated.  On the other hand, if there are no

5   claims of -- state law claims without infringement, then I can

6   easily go forward and do what you're asking, in my view.

7           MR. GROSSMAN:  One moment, your Honor.

8           THE COURT:  Okay.

9               (Counsel conferred off the record)

10          MR. GROSSMAN:  Your Honor, we're fine with the Court's

11  proposal.  We would give up the design-around claim that's

12  dependent upon the finding of noninfringement.

13          THE COURT:  All right.  So, the bottom line here, so

14  that everybody understands this, is that they are

15  acknowledging -- they're making a concession that I would rely

16  on in granting their request to enter judgment and dismiss --

17  judgment on the noninfringement and dismiss the state law

18  claims with prejudice subject only to their reinstatement in

19  the event that there is a reversal of my claim construction

20  ruling, and in making that request they are conceding that

21  their state law claims are dependent on a favorable

22  determination of their infringement claim, however it is

23  ultimately determined, and unless it is favorably determined to

24  them, they acknowledge that they cannot pursue any claim under

25  state law that they've asserted here based on the conduct that

1   is at issue here, which is manufacturing and selling the

2   allegedly infringing product.  I don't think that could be any

3   more clear, so if they are prepared to make that concession,

4   now is there anything else left that you're afraid of?

5           MS. CARROLL:  The other issue, your Honor -- and,

6   believe me, we've researched this a lot trying to figure this,

7   unscramble this -- as your Honor knows, we have several

8   invalidity defenses that we've offered, all of which we have

9   flagged.  I know that plaintiff also had an invalidity issue

10  they raised with respect to assignor estoppel, and in each

11  instance, both in the decision your Honor issued granting our

12  leave to put in an affirmative defense of invalidity and then,

13  again, at our claim construction hearing, your Honor said, "I'm

14  going to defer ruling on those -- on any of the invalidity

15  issues until we get to the summary judgment stage," which is

16  totally normal and fine.  However, that has not happened.

17          We, therefore, if we go up to the Federal Circuit, as

18  they wish, we are not in a position, on the defendant's side in

19  a position to raise any of those issues before the Federal

20  Circuit because your Honor has not ruled on them.

21          THE COURT:  Right.

22          MS. CARROLL:  And the Federal Circuit will say, "Are

23  you nuts?  Why are you trying to do this?  You have to go to

24  the District Court first."

25          THE COURT:  As they should.

1          MS. CARROLL:  As they should.  That's how it works.  I

2    totally understand that.  I'm not trying to jump the line.  Our

3    concern was that we not get boxed in.  Like, if we go up to the

4    Fed. Circuit now, as they want with this deal that we're

5    talking about now, they raise "stowed and deployed," what do we

6    do?  We've got issues we'd like to raise, kind of the next-step

7    issues with respect to your Honor's claim constructions which

8    implicate invalidity, such as lack of written description, lack

9    of enablement, indefiniteness premised on your construction.

10   We can't appeal those issues now, because we haven't gotten to

11   the end of the line on that at this court.  Are we, therefore

12   -- so, I think we're precluded from raising that now with the

13   Federal Circuit.  So, if the Federal Circuit affirms, case is

14   over.  If it remands and we come back and we're doing this

15   again, are we running a risk that we raise it the next time and

16   the Federal Circuit says, "Hey, that was a claim construction

17   issue; you waived that."  And we cited cases where that had

18   happened.

19          THE COURT:  No, no.  Everybody in this room will get

20   up and acknowledge on the record that, in the event that there

21   is a -- my summary judgment ruling on the infringement claim is

22   vacated and a new construction is required, either given to me

23   by the Federal Circuit or they somehow ask me to go back and do

24   something and reconsider, at that point your defense, which

25   doesn't get adjudicated now --

1          MS. CARROLL:  Right.

2          THE COURT:  -- your affirmative defense doesn't get

3    adjudicated now, becomes open for adjudication again.  You're

4    not waiving or precluding any ability to argue that invalidity

5    defense, and if the defendant thinks otherwise they need to

6    tell me.

7          MS. CARROLL:  You mean if the plaintiff.

8          THE COURT:  Plaintiff -- excuse me -- they need to

9    tell me.  Now, if you have sued somebody for negligence and

10   they move to dismiss and say, "You've sued Company A, I'm

11   Company B, I'm not the same company, and, by the way, your

12   claim is barred by the statute of limitations," and I say, "Oh,

13   you've sued the wrong company," and there's an appeal and the

14   Court of Appeals says, "No, you've sued the right company," you

15   wouldn't lose your statute of limitations affirmative defense,

16   just like you won't lose your invalidity defense.  It will be

17   available to you to the same extent it is available now.

18          Now, if I were to do what you wanted, what I would do

19   is I would evaluate an invalidity defense which would depend in

20   significant part on the claim construction I gave to the patent

21   at issue.

22          MS. CARROLL:  But not on the same term.

23          THE COURT:  Maybe not.  Maybe.  I am not willing to go

24   and spend a year and cause you to spent tens of thousands,

25   maybe 100,000 dollars litigating an invalidity defense that may

1    be based on improper claim construction by me or litigating an

2    invalidity defense that you may never have to litigate.

3            Believe me, one of the things I'm most concerned with

4    is I don't want to waste the time of an appellate court.  The

5    appellate courts are much more under stress than I am.  I don't

6    want to simply pass my work off to them.  If I thought I could

7    easily and simply resolve the case once and for all, I would.

8            But, ordinarily, when someone asserts an affirmative

9    defense and the defendant wins on the merits, you don't

10   litigate the affirmative defense, and the affirmative defense

11   goes away.  It becomes moot because you've won on the merits.

12   Here you've won on the merits.  There may be other tactical

13   reasons why you'd like to throw out this patent, but you don't

14   have a basis to challenge the validity of a patent when you're

15   not being charged with infringement, and I'm saying, based on

16   the statements that they've made, you're not being charged with

17   infringement.

18           So, I think, as a practical matter, you haven't

19   asserted a counterclaim.  This is an affirmative defense.  The

20   affirmative defense is to a claim that is no longer viable for

21   other reasons.  Judges don't decide issues that they do not

22   need to decide.  It's Basic Judging 101.  There are important

23   principles of judicial restraint that we do not reach out to

24   decide issues that we don't need to decide, and I don't need to

25   decide invalidity.  I may end up deciding it based on an

1    incorrect claim construction.  It's a gigantic waste of time if

2    I do that.  Here we have an issue that is well teed up for the

3    Federal Circuit.  They think I've made -- I don't know -- maybe

4    you could specify for me.  How many errors do you think I made?

5    Is it primarily the "stowed and deployed" issue?

6              MR. GROSSMAN:  That is the term that we would focus on

7    in our --

8              THE COURT:  That is a relatively easy thing to tee up

9    and brief.  You've both already done it once with me.

10             MR. GROSSMAN:  Yeah.  And just one other point of

11   order, your Honor.  With regard to Ms. Carroll's comment that

12   she's precluded, she argued during claim construction that

13   "centrally located" was indefinite.  In your order, your Honor,

14   you responded to that and said, if I may, you specifically said

15   you reject the indefinite argument on "centrally located."

16             THE COURT:  Right.  Well, to the extent I've ruled,

17   but I have also left open --

18             MR. GROSSMAN:  I agree.

19             THE COURT:  -- certain issues about invalidity.

20             MS. CARROLL:  Right.

21             MR. GROSSMAN:  I agree.

22             THE COURT:  Certain of their arguments as to why it's

23   indefinite, I agree I've rejected those.  To the extent I have,

24   those are my rulings.

25             MR. GROSSMAN:  Right.

1          THE COURT:  I'm not going to change them unless the

2     Court of Appeals tells me to do it.

3          MR. GROSSMAN:  Correct.

4          THE COURT:  But I did leave open other invalidity

5     arguments that would be litigated at a later date, and some of

6     those might turn on the claim construction that I have given to

7     the --

8          MR. GROSSMAN:  We're fine with it, your Honor.  But in

9     answer to your question, yes, our focus on appeal will be on

10    the "stowed and deployed" limitation.

11         THE COURT:  And do you agree that, in the event that

12    the claim construction is overturned and the ruling of summary

13    judgment on your infringement claim is vacated, that they in no

14    way lose their right to litigate any invalidity claim that I

15    have not already determined against them?

16         MR. GROSSMAN:  I agree with that.

17         THE COURT:  Okay.  So, again, it's a matter of

18    judicial estoppel.  I can't imagine the Federal Circuit would

19    say, "You waived your right to challenge invalidity because you

20    didn't raise it on appeal when the judge said, 'I'm refusing to

21    adjudicate your invalidity claim now,'" and your opposing party

22    has agreed that your claim will be fully preserved in the event

23    of remand.  I think that should take care of that concern.

24         MS. CARROLL:  Just, may I have a minute?

25         THE COURT:  Okay.

1            (Counsel conferred off the record)

2        MS. CARROLL:  Your Honor, I think this all seems to

3    make sense to us.  I think we have serious concerns with the

4    form of order that was put together by plaintiff's counsel.  We

5    would want something that's much clearer and more detailed like

6    your Honor has been addressing.

7        THE COURT:  Why don't you submit a proposal within

8    seven days.  Well, first, within seven days submit to opposing

9    counsel -- meet and confer and see if you can agree, and within

10   seven days thereafter, if you can agree, you'll file a joint

11   proposal.  If you can't agree, you'll each file your separate

12   proposal, and I will then enter judgment that I think is

13   appropriate after reviewing your submissions.

14       MS. CARROLL:  The other issue --

15       MR. GROSSMAN:  We're fine with that.

16       MS. CARROLL:  The other issue, your Honor, is we would

17   like, just again to protect us from any preclusion later,

18   though everyone in this room is agreeing we don't want that to

19   happen, rather than suggest it's a claim construction appeal, I

20   think we would want it -- it's an appeal of the construction of

21   the claim term.  I think they've just said "stowed and

22   deployed."

23       THE COURT:  No.  They are agreeing to the entry of a

24   judgment of noninfringement, summary judgment of

25   noninfringement based on my claim construction.

1        MR. GROSSMAN:  That's right.

2        THE COURT:  They can take an appeal from that order

3   and challenge whatever they want with respect to my claim

4   construction.

5        MR. GROSSMAN:  And our position is so can Ms. Carroll.

6   She's indicated in her opposing papers --

7        THE COURT:  I know.  I really messed it up.  Nobody

8   agrees.

9        MR. GROSSMAN:  She's attacking more of your

10  construction than we are.

11       MS. CARROLL:  No, no.

12       MR. GROSSMAN:  So, I don't believe that she's

13  precluded as a responsive party in the appellate proceedings to

14  argue for her construction.

15       MS. CARROLL:  Your Honor, this gets back into my

16  concern.  We are not challenging more of your order than they

17  are.  What we identified in our final invalidity contentions

18  and, again, in our opposition papers for this motion is that

19  there are invalidity arguments that arise based on the claim

20  construction.  That does not mean, for example, insufficient

21  written description as to certain terms.  That doesn't

22  implicate meaning your Honor gave a faulty claim construction.

23  It's more saying, based on this claim construction, there's

24  insufficient written description in the specification for that

25  particular construction.  That is not saying your Honor got it

1   wrong.  That's an invalidity argument.  And we are not --

2   several times this came up during the claim construction

3   hearing, your Honor.  We gave you the transcript and cited to

4   those pages where, when we raised those issues, you said, I'm

5   paraphrasing, but, "I hear you.  We will deal with that at the

6   summary judgment stage."

7          THE COURT:  But my order is my order.  What I wrote in

8   the order is what my decision is.

9          MS. CARROLL:  Right.

10          THE COURT:  That decision has caused the plaintiff to

11   conclude that they cannot prevail in light of that order.  They

12   should be entitled to take an appeal and argue that anything I

13   did or said in that order is incorrect; you should be able to

14   take an appeal that anything I did or said in that order is

15   incorrect.  But to the extent I do not address an issue of

16   invalidity, your right to litigate that issue on remand is

17   fully preserved if a remand is ordered.  You don't forfeit your

18   right to present additional invalidity arguments.  You remain

19   free to challenge any aspect of my order, as do they.  That's

20   the efficient way to resolve the case.

21          I took my best shot.  I might be right, I might be

22   wrong.  I defer to the expertise of the Federal Circuit.  I

23   respect them greatly and will just try to be a faithful

24   lieutenant and apply any guidance they give to me.  But that's

25   the most efficient way to resolve it, and that's what I intend

1    to do.

2           MS. CARROLL:  Well, I think, your Honor, we still have

3    those concerns in terms of what the Federal Circuit might do or

4    how they might view this, regardless of what everybody in this

5    room is agreeing.  But, hopefully, we can craft an order that's

6    clear enough to protect our rights, because we did find cases,

7    your Honor, where someone came back the second time and they

8    said, "Oh, well, you were already here and you didn't raise it

9    the first time," and I'm sure it was --

10          THE COURT:  I doubt those were cases in which the

11   District Judge specifically told the parties that, "You're not

12   precluded from raising these issues later on."  The opposing

13   party got up and agreed that you weren't precluded from raising

14   them later on.  They're estopped from arguing otherwise.  What

15   reason would the Federal Circuit do that where everybody

16   induced you to go along with this by telling you your arguments

17   aren't waived and then the Federal Circuit says, "Well, too

18   bad; they're waived"?

19          MS. CARROLL:  Well, your Honor, I think that's just

20   why I think we need to be not just clear orally as we're

21   talking but clear in the order.

22          THE COURT:  And I'm willing to have you try to do

23   that.

24          MS. CARROLL:  Yeah.

25          THE COURT:  I'm understanding the point you're raising

1    now that I did not get in your pleadings.

2        MS. CARROLL:  I'm sorry.

3        THE COURT:  Let me state it back to you and make sure

4    that I'm on it completely.  In certain portions of my claim

5    construction order you made an assertion that a claim term was

6    indefinite, right?  And I responded with respect to some of

7    those arguments by saying, "The term means this.  It's not

8    indefinite, it means this."  You're afraid that if you try to

9    argue that I was wrong about that and say it's indefinite that

10   you will waive any other invalidity defense you might have?  Is

11   that what your concern is, that by engaging in a challenge to

12   that portion of my order you will waive the right to litigate

13   subsequently invalidity arguments that I did not adjudicate in

14   the order?  Is that what you're concerned about?

15       MS. CARROLL:  Yes, yes.  And I think in some of

16   them -- yes, I think that's saying it accurately, because some

17   of them, you know, there were issues like, for example, lack of

18   written description, which come up which your Honor didn't

19   reach.  I mean, there are several times -- and I'm not saying

20   any of this critically.  It's the same as the assignor estoppel

21   issue they raised, and your Honor said, "I will address that

22   when it's fully briefed in summary judgment."  So, we have some

23   of these issues hanging out there.

24       I'm not trying to make work for anybody or have it

25   just be because it's entertaining and what we do; I'm just

1   trying not to be looking at this a year from now, going, "Oh,

2   we really shot ourselves in the foot and we kind of lost what

3   we thought was a really meritorious argument."

4           THE COURT:  I understand the fear that lawyers have

5   that Courts will do irrational things, and I just have to tell

6   you I have greater faith in the Federal Circuit than you do, I

7   guess.  I made certain rulings.  To the extent I've made a

8   ruling and it's incorrect, you should tell the Federal Circuit

9   that it was incorrect.  To the extent I said, "I'm not ruling

10  on that issue now," the Federal Circuit can't and I can't

11  imagine would ever say to you, "Because you didn't raise those

12  issues that the judge said he didn't need to reach below,

13  you've lost your right to have those reviewed subsequently."

14  Unless the Federal Circuit ordered me not to, I'm telling you

15  what I would do if they remanded the case to me.  I would say,

16  okay, here they've reversed me on A, B and C and told me what

17  to do, A, B and C.  I'm going to do that.  Now, everything else

18  that was undecided by me on invalidity, I'll now have to go and

19  decide, and, unless I determine that there is summary judgment

20  or noninfringement based on the new construction, I would then

21  go on and decide the invalidity claims.

22           MS. CARROLL:  Okay.

23           THE COURT:  I can give you this much of assurance.  I

24  can't bind the Federal Circuit, but I can give you this

25  assurance:  I will not deprive you of the ability to litigate

1   your invalidity defense if the case is remanded unless I am

2   expressly ordered to do that by the Federal Circuit, because it

3   would be manifestly unjust to do that, and I will not do it

4   unless I'm expressly ordered to do it by the Federal Circuit.

5   And then, if I entertain the matter on invalidity and I rule

6   against you, I will make clear on the record, if you remind me,

7   that I told you that those issues would be fully open to be

8   litigated again, and you relied on that in taking the positions

9   you took on appeal.  Judicial estoppel can bind parties, but

10  there are also times in which the representations that the

11  judge makes to the parties can be reasonably relied on by the

12  parties as well, and I think that would be a case where you

13  have a very strong argument that you can reasonably rely upon

14  the assurances that I've given you.

15          I'm looking to find the most efficient way to help you

16  resolve this dispute, and as long as your rights are protected,

17  and I think you've done a good job of making clear that certain

18  kinds of arguments that they might have wanted to reserve,

19  because a lawyer always likes to reserve everything possible,

20  they're going to agree they're not going to pursue.  Other

21  arguments they have, they will be able to litigate them on

22  remand.  You will be able to litigate on remand any issue that

23  I did not decide in this prior order that would be appealed

24  from except to the extent that the Federal Circuit takes some

25  kind of action, and I will follow any Federal Circuit action,

1   and then I will allow you to relitigate issues that I left

2   unresolved.

3           So, at some point I understand the fear that lawyers

4   have, but judges try to get the right thing done.  The right

5   thing done here is -- and I commend you for doing this.  You

6   make an assessment and say, you know, "We'll live or die with

7   our effort to get the Federal Circuit to overturn the judge on

8   this."  That's a good thing to do.  I understand your caution.

9   You've raised your points.  You've achieved some further

10  concessions from the other side.  I've made clear to you to the

11  extent I possibly can that issues that you raised previously

12  but I left unresolved will still be open to you in the event

13  that there is a remand, unless, of course, I decide in your

14  favor again on noninfringement.

15          All right.  So, I will give you -- you should take the

16  next step, because you're the one that's most concerned about

17  this, which is within the next seven days share with them a

18  proposal.

19          MS. CARROLL:  Sure.

20          THE COURT:  You then meet and confer, and within seven

21  days thereafter, so 14 days from today you will either file,

22  which I hope you will do, a joint proposal for the order, in

23  which case I'm strongly inclined to defer to what the parties

24  suggest.  To the extent you have different views say, "We agree

25  on A, B and C, our only disagreement is I want these three

1    things and they say, 'No,'" I'll look at it and decide what to

2    do and issue an order.

3          And I commend both sides for good lawyering here.

4    This is what you're supposed to do, but I think we've

5    adequately addressed the issues, and I don't need to take any

6    further action at this time.  I'll wait for your joint

7    submission and take action after receiving it.

8          All right.  Is there anything else we need to cover

9    today?

10          MR. GROSSMAN:  We're fine with that.  Thank you, your

11    Honor.

12          MS. CARROLL:  Thank you.

13          THE COURT:  Okay.

14          THE CLERK:  All rise.

15       (WHEREUPON, the proceedings adjourned at 2:48 p.m.)

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4         I, Brenda K. Hancock, RMR, CRR and Official Court

5    Reporter of the United States District Court, do hereby certify

6    that the foregoing transcript constitutes, to the best of my

7    skill and ability, a true and accurate transcription of my

8    stenotype notes taken in the matter of *AntennaSys, Inc. v.*

9    *AQYR, Inc., et al.*, No. 1:17-cv-00105-PB.

10

11

12

13

14   Date:    6/28/19

15                              BRENDA K. HANCOCK, CRR, RMR

16                              OFFICIAL COURT REPORTER

17

18

19

20

21

22

23

24

25